**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

FRANK BURRELL,

     *Plaintiff,*

     v.

ALBERT GRAF, ROGER MURPHY, MICHAEL
QUALLS, WILLIAM GROELLER, TIMOTHY
NOLAN, DANIEL MCNALLY, FREDERICK O.
BONKE, the CITY OF CHICAGO, MARIA
KURIAKOS, PAUL KARLOVICS, and COOK
COUNTY

     *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**JURY TRIAL DEMANDED**

**COMPLAINT**

NOW COMES Plaintiff, FRANK BURRELL, by his attorneys LOEVY & LOEVY, and
complaining of Defendants ALBERT GRAF, ROGER MURPHY, MICHAEL QUALLS,
WILLIAM GROELLER, TIMOTHY NOLAN, DANIEL MCNALLY, FREDERICK O. BONKE,
the CITY OF CHICAGO, MARIA KURIAKOS, PAUL KARLOVICS, and COOK COUNTY,
and states:

**INTRODUCTION**

1.     Plaintiff Frank Burrell was in the formative years of his 20s when he was arrested,
prosecuted, and ultimately wrongfully convicted for the 1999 murder of Renee Battle.

2.     Ms. Battle was killed as the result of a tragic, high-profile drive-by shooting in
Hyde Park, Chicago. By all accounts, the shooters were targeting the car because Ms. Battle's
then-boyfriend, Marc Davis, was the driver.

3.    Burrell had nothing to do with the crime. Not one piece of physical or forensic evidence connected him to the murder.

4.    Nonetheless, Burrell was arrested, tried, and convicted of crimes he did not commit as a result of the misconduct of Chicago Police Department officers, and other officials, who fabricated evidence against Burrell while suppressing information that would have prevented the prosecution and conviction in the first place.

5.    Defendants' misconduct caused Plaintiff to be convicted following a criminal trial and he was wrongfully imprisoned until 2019, when he was released. Even then, Mr. Burrell was not free—his liberty was restricted, he was subject to a cloud of criminal charges, and he was branded a murderer until the charges were finally dismissed in 2024.

6.    The more than two-decades-long saga of wrongful murder charges caused Mr. Burrell tremendous harm. He missed out on precious time with family and friends and spent time in Illinois prisons where he endured violence and the constant struggle of knowing he might spend the rest of his life carrying the label of "murderer" for a crime he did not commit.

7.    Burrell's wrongful conviction was no accident. Nor was it an isolated incident. Instead, the misconduct that caused Burrell's wrongful conviction is part and parcel of the policies, practices, and customs of the Chicago Police Department, and thus the City of Chicago.

8.    Burrell now brings this lawsuit seeking redress for the devastating injuries he endured and continues to suffer because of Defendants' misconduct and to hold accountable those who caused this tragedy.

## JURISDICTION AND VENUE

9.    This action is brought pursuant to the United States Constitution, 42 U.S.C. § 1983, and Illinois law to redress Defendants' tortious conduct and the deprivation of Plaintiff's rights.

10.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C § 1331 and it has jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

11.     Venue is appropriate in this district because the events underling this suit took part in Cook County, Illinois, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. 28 U.S.C. § 1391(b).

## PARTIES

12.     Plaintiff Frank Burrell is a resident of Cook County, Illinois. He spent nearly two decades wrongfully imprisoned for crimes he did not commit. Now free, Burrell spends his time with family and working to rebuild his life.

13.     At all times relevant to the events described in this complaint, Defendants Albert Graf (Star #20480), Roger Murphy (Star #20681), Michael Qualls, Daniel McNally, Timothy Nolan, William Groeller, and other unknown law enforcement officers (together, the "Police Officer Defendants") were officers with the Chicago Police Department (CPD) who acted under the color of law and within the scope of their employment.

14.     At all times relevant to the events described in this complaint, Defendant Frederick O. Bonke, and other unknown law supervisory officers of the CPD were supervisors of the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Police Officer Defendants whom they supervised.

15.     Defendant City of Chicago is a municipality and was or is the employer of each Police Officer Defendants. The City of Chicago is liable for the Police Officer Defendants' misconduct while acting within the scope of their employment for the City. The City of Chicago is liable for all torts committed by the Police Officer Defendants' while employed by the City of

Chicago pursuant to the doctrine of *respondeat superior*. Defendant City of Chicago is additionally responsible for the policies and practices of the CPD.

16.     At all times relevant to the events described in this complaint, Defendants Maria Kuriakos and Paul Karlovics (Prosecutor Defendants) were Assistant State's Attorney's for the Cook County State's Attorney's Office (CCSAO). These Defendants worked with the Police Officer Defendants—while acting in an investigatory capacity, under the color of law, and within the scope of their employment—to conceal and fabricate evidence, manipulate witness testimony, obtain false statements, and maliciously prosecute Plaintiff for Renee Battle's murder.

17.     Defendant Cook County is a county in Illinois that employed the Prosecutor Defendants. The County has *respondeat superior* liability for the Prosecutor Defendants' tortious acts under state law and is obligated to indemnify them.

18.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Murder of Renee Battle and Attempted Murder of Marc Davis

19.     On the evening of July 7, 1999, Renee Battle her boyfriend, Marc Davis, and their 8-year-old son were driving home after spending time at the beach on Lake Michigan. It was nighttime.

20.     Davis was driving his car, a 1996 green Chevy Tahoe, while Ms. Battle was in the passenger seat, and the child was in the back seat.

21.     Davis's green Tahoe was well known to people in the community. At the time, Marc Davis was involved with the Black Stones street gang, and his car was well-known given his

rank and activity within the gang.

22.     Davis was driving his green Tahoe on 51st Street in Hyde Park, Chicago and was preparing to stop at a four-way stop sign at the intersection of Blackstone Ave and 51st Street.

23.     As Davis approached the intersection and was preparing to stop, another car pulled up on the passenger side of the Tahoe.

24.     Davis would later describe this car as an older, silver, and as having four doors.

25.     That car pulled up and stopped in front of the right passenger side of Davis's Tahoe, as if to block him from continuing through the intersection.

26.     Davis did not engage with the driver of the other vehicle.

27.     Instead, Davis began to proceed through the intersection but the other vehicle pulled to the side/front of Davis's Tahoe, again as if to block him from continuing down the road.

28.     Rather than trying to block Davis, the other car veered to the right and shot into Davis's Tahoe—from the passenger side toward Davis.

29.     While simultaneously driving the Tahoe and hearing the shots, Davis ducked down and tried to get his son down as well.

30.     Both Davis and his son were unscathed.

31.     Tragically, however, Ms. Battle was shot in the head.

32.     The vehicle completed its right turn and drove northbound on Blackstone Ave.

33.      Davis drove Ms. Battle to the hospital; she died from her injuries around midnight.

34.     The CPD investigated the crime, and police presence was thorough and swift. The shooting happened just a few minutes away from a large police station at 51st and Wentworth, a facility that housed police officers, tactical officers, and the Area One Detective Division.

35.     Defendants, then detectives, Al Graph and Roger Murphy began investigating that night. Defendant Michael Qualls, then a CPD tactical officer, was also assigned to the case. In addition, Defendant Groeller, also a detective at the time, was assigned to work the case.

36.     That night, Davis told police—including Defendants Graph, Murphy—about the shooting. Davis was extremely cooperative.

37.     In so doing, Davis honestly told police the car where the shots came from was an older model, was silver, had four doors, did not have license plates, and had an orange license applied for sticker in the rear window.

38.     Davis also told police that he could not identify how many people were in the silver four-door car that had shot at him.

39.     Based upon Davis's statements, and their canvas, CPD officers located a car they thought may have fit the description of the car from which the shots were fired. That car was a four-door Chevy Celebrity with an orange license applied for sign in the rear window.

40.     Davis traveled with CPD officers, including Defendants Graf and Qualls, to where the car was found to view the Chevy Celebrity. Davis told investigators that car was similar to the one involved in the shooting.

41.     The CPD officers found the owner of the Chevy Celebrity, but concluded he was not involved in the shooting.

42.     Davis did not know the person who tried to kill him and that killed his girlfriend.

43.     As a result, the only information he could provide was that he believed the shooter put their arm out of the window of the car, and that the perpetrator was light skinned, black, and approximately in their 20s.

44.     With Defendants Graph and Murphy as the lead detectives, numerous CPD officers

6

worked to respond to the shooting. Among other things, Defendants Graf, McNally, Nolan, and Murphy investigated the scene of the crime and canvassed the neighborhood after the shooting but were unable to discover information about the identity of the shooter.

### Burrell Is Innocent

45.     The shooting of Renee Battle was horrific and stunning.

46.     Frank Burrell had absolutely nothing to do with the crime.

47.     No evidence pointed to this shooting having anything to do with Burrell.

48.     In addition, Burrell knew Davis and Davis knew Burrell. Though they were not close at the time of the shooting, Davis and Burrell knew one another very well. Davis knew Burrell's full name and some of his family members.

49.     Yet, in the aftermath of the crime—when Davis was willing to ride in a police car to search for the perpetrator—Davis did not say or suggest that it was Burrell who had committed the crime.

50.     Burrell could not have committed the crime, either. For one, Burrell did not have a car, let alone a silver four-door car as described by Davis.

51.     In addition, Burrell worked at a film studio in July 1999. Burrell worked the day of the Battle shooting. Burrell had gone to work, completed his janitorial work, and took public transit home. As a result, in addition to the fact that he *did not* commit the crime, Burrell *could not* have committed the crime—he was not at or near 51st and Blackstone that evening.

### Defendants Fabricate that Burrell Was Involved In The Shooting

52.     After the shooting, Davis tried to figure out who had shot at him—he wanted to know if it was a "sanctioned" gang hit or something else.

53.     To that end, Davis had meetings with gang members, and even non-gang members

discussing the fact that he did not know who had tried to kill him and who had killed his girlfriend.

54.     There was tremendous pressure on Davis, and on the CPD, to "close" this case. Understandably, Ms. Battle's family wanted to know how something so shocking could happen to their family. Davis knew that the perpetrator (or perpetrators) were after him, and so felt obligation to Ms. Battle's family to atone for Battle being killed because of him. In addition, a drive-by shooting out of nowhere in Hyde Park near the beach and on the same street as a major police station put tremendous pressure on the Police Officer Defendants to solve the case.

55.     Weeks passed with Police Officer Defendants developing no information that connected Plaintiff in any way to this shooting.

56.     Defendant Qualls, who had gone to high school with Davis and Battle, was in communication with Davis in the two-three weeks after the murder. Consistent with the fact he did not know who the shooter was, Davis did not identify a particular person as the perpetrator or ever say that he knew the number of people in the silver car.

57.     At some point at or near the end of July 1999, the Police Officer Defendants, including Groeller, Graph, Murphy, and Qualls, decided to put the murder on Burrell.

58.     In a manner that Defendants still have not disclosed to this very day, Defendants enlisted Marc Davis as part of the fabrication.

59.     Though the claims were false, in August 1999, Defendants wrote reports saying that Davis indicated he knew who the shooter was but that he did not know the person's actual name and only had a nickname of "Akbar." According to the fabricated reports, it was at this point—and not before—that they were able to "solve" the identity issue when Defendant Groeller informed Davis and Defendants Qualls, Graph, and Murphy that "Akbar" was actually Frank Burrell.

8

60.     Of course, and in reality, this entire narrative was false.

61.     For one, Burrell did not commit the crime. In addition, Davis and the officers knew Frank Burrell's name before August 1999, and they knew that Davis could not possibly identify someone involved in the shooting a month after the fact. Defendants' reports are written to obscure and hide these facts, and Defendants have never disclosed the extent of their misconduct.

62.     The notion that Davis could suddenly turn an about-face and "identify" the shooter was obviously preposterous. In addition, the idea that Davis would need to see a lineup or photo array to identify Burrell was also complete farce.

63.     Nonetheless, the Police Officer Defendants, including Graph, Murphy, Qualls, and Groeller, wrote and/or contributed to reports purporting to memorialize, and solidify, the fake "identification."

64.     Given the obviously flawed (and fabricated) idea that Davis could "identify" Burell as the shooter, Defendants and Davis fabricated additional evidence. For example, though the extent of their efforts have not been disclosed to this very day, Defendants wrote reports saying that Davis told Groeller he could now identify that there were three people in the car. In addition to naming Burrell (as Akbar), the police claim, Davis told Defendant Groeller that, coincidentally enough, Davis also knew the names of theses previously unknown suspects—Marshawn Hatcher, and Jerry Morton.

65.     In fabricating additional evidence, Defendants Qualls, Murphy, Groeller, and Graph enlisted additional law enforcement officers to attempt to make it seem as though the wholly bogus story that Davis could identify Hatcher and Morton (and Burrell), and that Hatcher and Davis saw Burrell commit the shooting.

66. Morton and Hatcher never saw Burrell commit the shooting, as they could not have seen Burrell do something he never did.

67. Nonetheless, in statements fabricated by the Police Officer Defendants and the Prosecutor Defendants, and via acts of either coercion and false promises, Morton and Hatcher provided fabricated accounts suggesting that Burrell had been driving around with them for hours that day, drinking and getting high, and shot Davis, conveniently without them having any knowledge of their being a gun in the car or any knowledge that Burrell, who they claimed was driving, was going to shoot at someone.

68. In 1999, Chicago Police Department Officers worked hand-in-hand with members of the Cook County State's Attorney's Office investigating cases before charges were filed. In this role, prosecutors worked as part of the "Felony Review Unit" (FRU) but conducted their work in police station, on the street, or other locations along with police—not as advocates for the State of Illinois in Court.

69. Here, Defendants Kuriakos and Karlovics were both FRU prosecutors and involved in the investigation of the murder of Renee Battle and attempted murder of Marc Davis in such a capacity.

70. In addition to fabricating information in police reports, Defendants' efforts included fabricating written statements that Morton and Hatcher signed.

a. For Morton, the police reports and "statements," which included obviously false and outlandish information, were generated by the work of Defendants Tim Nolan, Daniel McNally, and former ASA Paul Karlovics, who traveled to McLean County to speak with Morton as an investigator alongside the police. Among other things, these false statements were prompted by promises of lenient treatment on Morton's other criminal cases.

b. For Hatcher, the police reports and "statements," included obviously false and outlandish information, were generated by the work of Defendants Graf, Qualls, and former ASA Maria Kuriakos, who traveled to Area One Detective Division to speak with Hatcher alongside the police. Defendants knew that Hatcher's statements were both untrue and the result of misconduct (the full extent they still have yet to fully disclose), and so had him sent to the grand jury as a mechanism of trying to preserve as much of the fabrication as they could once out of police custody. Among other things, Hatcher was subject to violence and other misconduct in prompting him to sign to the fabricated account, which Defendants were able to exercise greater control over than Morton because Hatcher was in Chicago.

71. On the basis of entirely fabricated evidence, Defendants then had Burrell arrested. Defendant Qualls effectuated the arrest, and wrote untrue statements in his report about how the arrest occurred. In particular, Defendant Qualls made it seem as if Burrell was trying to flee the police due to some sort of guilty conscience for the Battle shooting; an insinuation that is completely false.

72. Even still, Defendants knew that there was no probable cause to believe Burrell committed the crime and that they would need to try to sure-up their bogus case. In fabricating

further evidence, Defendants had Davis come to the police station to "identify" Burrell from a live lineup, as if Davis did not know Burrell and as if Defendants and Davis had not already agreed to point the finger at him.

73.     Knowing that documenting their misconduct, and what actually occurred would doom any prosecution, Defendants either (1) refused to memorialize the entirety of their conversations with Davis or (2) memorialized their conversations with Davis in police reports that were either destroyed or, at minimum, remain hidden to this day.

74.     The police reports the Police Officer Defendants created are irregular and include obvious gaps and flaws, owing to the fact they are fabricated and part and parcel of masking the misconduct that prompted a bogus case against Burrell for a crime he did not commit.

75.     Defendants knew prosecuting Burrell would be problematic—there was no murder weapon, they knew that Burrell worked at the film studio, and they did not even have a suspect vehicle. As a result, rather than admitting their misconduct, Defendants fabricated the notion that Burrell could have committed the crime by driving his grandmother's car. Defendants knew this was false. Burrell's grandmother's car did not fit the description provided by Davis of the perpetrator's vehicle; it had two-doors, not four; it was white not silver; it had license plates; it did not have an orange sticker in the window; and Burrell did not have access to the car.

76.     The Police Officer Defendants worked directly under the supervision of Defendant Frederick Bonke. Bonke signed off on nearly every fabricated report authored in this case and was, therefore, a participant in the generation of this evidence against Burrell.

**Despite His Innocence, Burrell Is Wrongfully Convicted**

77.     As a result of Defendants' work, Burrell was charged with murder and attempted murder for crimes he did not commit.

78.     Before Davis claimed to "identify" Burrell there was no probable cause to suspect Plaintiff of the murder.

79.     After Davis claimed to "identify" Burrell there was no probable cause to suspect Plaintiff of the murder.

80.     Before Hatcher and Harris were interviewed, there was no probable cause to suspect Plaintiff of the murder.

81.     After Hatcher and Harris were interviewed, there was no probable cause to suspect Plaintiff of the murder.

82.     Nonetheless, Burrell was charged and the matter proceeded to trial based on entirely fabricated evidence. Before trial, the CCSAO relied upon the police reports and handwritten "statements" in charging Burrell, in preparing its case before trial, and in making strategic decisions in the case. At trial, the fabricated reports and "handwritten" statements impacted the proceedings, and were used by the prosecutors and defense attorneys and in the examination of witnesses.

83.     The content of the fabricated reports—including that Davis identified Burrell almost a month after the crime and that Hatcher and Morton were there, too—were part of the evidence used at trial.

84.     At no point before the trial, or even after, did Defendants disclose the favorable evidence they had about Burrell, including their own misconduct, their own fabrications, and the entire circumstances behind how Burrell was made a suspect in the first place.

85.     Despite his innocence, with fabricated evidence used against him and favorable information suppressed, Burrell was wrongfully convicted and imprisoned.

86.     It took decades for Burrell to secure his freedom. In 2019, some twenty years after

this ordeal began, the Court of Appeals vacated Burrell's conviction following the presentation of evidence that he could not have committed the crime because he was working at the film studio when Hatcher and Morton falsely claimed Burrell was riding around with them drinking and getting high in the run-up to the shooting.

87.     Even then, the weight of the fabricated evidence and suppression of favorable evidence continued to cause Burrell harm. Burrell spent the next nearly five years under indictment and facing a retrial. In this time, Burrell was on bond and faced continued restrictions on his liberty.

88.     Finally, with retrial set to commence for a third time in as many weeks, the State moved to dismiss the charges against Burrell in March 2024.

### The City of Chicago's Policies and Customs Caused Burrell to be Wrongfully Convicted

89.     The City is responsible, by virtue of its policies, practices, and customs, for inflicting miscarriages of justice in scores of incidents like the one Burrell endured.

90.     Since 1982, over 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

91.     In these cases, CPD officers used the same or similar tactics Police Officer Defendants employed against Burrell here, including fabricating evidence or suppressing material information.

92.     At all relevant times, members of the CPD, including the Police Officer Defendants, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

93.     As a matter of widespread custom and practice, members of the CPD, including the Police Officer Defendants, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

94.     The City's practices are myriad. For example, led by Jon Burge and others under his watch at Area Two and then Area Three, CPD officers would routinely work to fabricate false statements during the late 1970s, throughout the 1980s, and into the 1990s and beyond. The City learned about these practices in 1982 when Andrew Wilson and Jackie Wilson were tortured—Andrew was tortured so badly that the jail would not even take him.

95.     The City knew, or should have known, that these practices continued when Burge and other officers tortured Aaron Patterson and Eric Caine in 1986, with Patterson even etching into a bench he had been tortured.

96.     The City knew, or should have known, that the coerced and fabricated statements practice extended beyond Areas Two and Three and beyond Burge and his closer associates into other parts of the City and involving other officers in the 1980s and 1990s.

97.     For example, in 1991, Detective Kenneth Boudreau, with Detective Michael Kill, participated in the interrogation of Anthony Jakes that resulted in generation of a fabricated statement that include events that were physically impossible. Jakes was a child at the time. In 1992, Boudreau, with Burge and others, participated in the coordinated coercion of a group of Black teenagers, Damoni Clemon, Iamari Clemon, Jessee Clemon, Tremaine Green, Clinton Welton, and Diyez Owens, none of whom stand convicted despite the claim they "confessed" and the generation of multiple "statements" witnessed or authored by FRU ASAs.

98.     Detective Boudreau and other CPD detectives also obtained false witness statements from Harold Hill, Peter Williams, and Dan Young. Again, it was the CPD officers who made-up the narrative that appeared in the "statements" attributed to these three. And, as in the Jakes case, the statements included claims that were physically impossible. This time, the notion that Williams committed a heinous crime with Hill and Young was totally undermined when Detectives learned that Williams was in custody when the crime happened. Rather than disclose their misconduct and acts of fabrication, CPD officers doubled down and fabricated more evidence and pursued the wrongful convictions of Hill and Young, both of who were later exonerated.

99.     The City knew, or should have known, that Detective Kriston Kato and others were fabricating statements from people out of Area Four Detective Division, including abusing Frederick Seaton in 1988, Michael Waslewski and Daniel Gasca in 1990, and Andre Wallace in 1994.

100.    Likewise, the City knew, or should have known that Detective Reynaldo Guevara and others, based out of Area Five, were fabricating statements and suppressing information related to "identifications" in the 1990s as well, including the dozens of people now exonerated following Guevara's misconduct.

101.    The City knew, or should have known, that the pattern of fabrication and evidence suppression extended to Area Six Detective Division, too. For example, Daniel Taylor, Deon Patrick, Lewis Gardner, Rodney Matthews, Paul Phillips and others were coercively interrogated in 1992 by detectives based out of Area Six.

102.    What happened at Area One in the 1990s was no different, and the acts were perpetuated by detectives—like the Police Officer Defendants here—at Area One included the same pattern of fabricating statements, suppressing exculpatory information, and causing wrongful

convictions. For example, in 1995, Area One detectives fabricated statements they attributed to five teenagers—Harold Richardson, Vincent Thames, Michael Saunders, Terrill Swift, and Jerry Fincher. While the Fincher statement was suppressed, the other individuals were wrongfully convicted and served significant sentences before being exonerated after DNA evidence proved the confessions were false.

103. The wrongful convictions of innocent persons include numerous cases in which Chicago police detectives used the very same tactics that Police Officer Defendants employed in this case. These tactics include: (a) fabricating narratives of how a crime occurred and/or how a person became a suspect; (b) the suppression and concealment of exculpatory information, including fabricated information; and (c) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department Offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate or misleading. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

104.    At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

105.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

106.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Fields v. City of Chicago*, 10 C1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536, 88 Civ. 1127 (N.D. Ill.).

107.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the early 2000s, including at the time of the Battle murder and investigation at issue here.

108.    In addition, a set of clandestine street files related to Area 5 homicides was found in the case of *Rivera v. City of Chicago*, 12 Civ. 4428 (N.D. Ill.). Those files also contained exculpatory and impeaching evidence not turned over to criminal defendants.

109.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Battle murder, including in the

Area One Detective Division in the 1990s (which is where the *Fields* file was located and where

other files were discovered hidden in the basement)

110.   The City of Chicago and the Chicago Police Department routinely failed to

investigate cases in which Chicago Police Detectives recommended charging an innocent person

with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his

misconduct in any of those cases.

111.   Before and during the period in which Burrell was falsely charged with and

convicted of murder, Defendant City knowingly operated a dysfunctional disciplinary system for

Chicago police officers accused of serious misconduct. The City almost never imposed significant

discipline against police officers accused of violating the civil and constitutional rights of members

of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police

officers who were repeatedly accused of engaging in misconduct. This allowed CPD officers to

commit misconduct with impunity.

112.   The City also failed, in the years prior to Burrell's wrongful conviction, to provide

adequate training to Chicago police detectives and other officers in many areas, including the

following:

a.     How to properly preserve and document witness statements;

b.     The constitutional requirement to preserve and disclose exculpatory evidence,

including how to identify such evidence and what steps to take when exculpatory evidence has

been identified in order to ensure that the evidence is made part of the criminal proceeding;

c.     The risks of wrongful conviction and the steps officers should take to minimize

risks;

d.     The risks of engaging in tunnel vision during investigation; and

e.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

113.   The need for police officers to be trained in these areas was—and remains— obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Burrell's wrongful conviction and his injuries.

114.   As evident in Defendant Bonke's conduct here, the CPD also failed to appropriately supervise its officers. The United States Department of Justice ("DOJ") issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training" and the deficiencies mirror those alleged here.

115.   Since before Burrell's arrest and continuing for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

116.   Numerous municipal policymakers have even admitted the code of silence exists.

117.   As a result of these practices of the City, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens, knowing the City's lack of discipline and supervision and its code of silence will protect them.

118.   Part and parcel of this history of fostering egregious misconduct, the CPD has a long history of generating fabricated accounts, including false statements from witnesses and suspects in criminal cases, which has caused wrongful convictions, described above.

119. In so doing, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

120. The practice of obtaining bogus witness statements by CPD has had, for decades, a concomitant practice involving FRU ASAs reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

121. The process is designed to provide an air of legitimacy to the interrogation and "confession" but really is intended to make it harder for someone who has been coerced to bring the truth to light in court proceedings because they must overcome the lies of the police as well as the involvement (even if they are unaware of or not part of the coercion) of a prosecutor who will testify as a witness at trial (and who is not the CCSAO attorney who acts in a prosecutorial function at trial).

122. The FRU ASA's work alongside police officers, approving statements in case after case after case. As a consequence, the misconduct and coordination between the Police Officer Defendants Prosecutor Defendants during the investigation of the Battle murder was not unique or isolated. Instead, members of the FRU, as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating statements attributed suspects or witnesses in CPD custody and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

123. At all relevant times, the CCSAO typically staffed the FRU with new, young prosecutors. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the detectives, because performance in the FRU is a stepping stone to getting to the Trial Division of the CCSAO.

124.     The FRU attorneys are also implicitly taught, through pressure from CPD officers and their own supervisors, that they had to approve detectives' charges even if they did not believe there was enough evidence, because standing in the way could be an impediment to getting into the Trial Division and because they would be punished by their supervisors for not being "team players." Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive to expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

125.     In the end, the very structure of having FRU attorneys at a police station is a significant outlier in policing in the United States—one designed to protect CPD misconduct and secure wrongful convictions on flimsy, coerced, or fabricated evidence.

126.     The City's failure to train, supervise, and discipline its officers, including Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Burrell in this case. Constitutional violations, such as those that occurred in this case, are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

127.     The City and its final policymaking officials failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Burrell's ongoing injuries.

128.     The practices described in the foregoing paragraphs were approved by final deliberately indifferent policymakers for the City.

22

**Burrell's Immense Damages**

129.    For nearly 26 years, Burrell was forced to suffer under a prosecution, imprisonment, and potential reincarceration for a murder he did not commit.

130.    Burrell was arrested during his formative years—his mid-20s—and was in the process of building a life for himself. He had small children he loved and cared for. As a result of being wrongfully arrested, prosecuted and convicted, Burrell was estranged from his children—a harm he still mourns to this day.

131.    Aside from being on bond for part of the time before trial, Burrell spent the better part of two decades—between 1999 and 2019—imprisoned. During that time, Burrell was required to live in conditions that were inhumane and damaging to his physical and mental health. During his wrongful incarceration, Burrell was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Burrell missed out on the ability to share holidays, the funerals of friends and loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

132.    Burrell's pain continued after his release, when he was still subject to limitations on his liberty, to bond requirements, and being forced to appear in court again and again.

133.    Having the 1999 murder charges hanging over his head also substantially harmed Burrell between 2019 and 2024. Indeed, though the conviction had been vacated, Burrell was denied housing and employment opportunities due to the bogus charges and prior wrongful conviction. Burrell must now attempt to make a life for himself outside of prison without the benefit of nearly three decades of life experiences, which normally equip adults for the task.

134.    Burrell has suffered tremendous damage, including loss of liberty, physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of Due Process under the Fourteenth Amendment

135.   Each paragraph of this Complaint is incorporated as if restated fully herein.

136.   As described above, the Police Officer Defendants and Prosecutor Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Burrell of his constitutional right to due process and a fair trial.

137.   As described above, the Police Officer Defendants and Prosecutor Defendants deliberately withheld exculpatory and impeachment evidence from Burrell, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Burrell's criminal prosecution.

138.   In addition, as described above, the Police Officer Defendants and Prosecutor Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Burrell, suborned perjury, obtained Burrell's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Burrell during his criminal trial.

139.   The Police Officer Defendants and Prosecutor Defendants concealed/suppressed favorable evidence not yet known to Burrell. In addition, on information and belief, the Police Officer Defendants and Prosecutor Defendants may have fabricated additional evidence that is not yet known to Burrell.

140.   As described above, the Police Officer Defendants and Prosecutor Defendants individually, jointly, and/or in concert and conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, Defendants violated their

clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and witness statements.

141. The destruction and/or loss of evidence was done in bad faith, and/or was done so Burrell could not present obviously exculpatory evidence at trial.

142. The Police Officer Defendants' and Prosecutor Defendants' misconduct directly resulted in Burrell's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Burrell's prosecution would not and could not be pursued, and there is a reasonable probability that the outcome of Burrell's criminal case would have been different.

143. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's innocence.

144. As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

145. The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

### COUNT II – 42 U.S.C. § 1983
### Liberty Deprivation without Probable Cause in Violation of the Fourth Amendment

146. Each paragraph of this Complaint is incorporated as if restated fully herein.

147. As described above, the Police Officer Defendants and Prosecutor Defendants individually, jointly, and in conspiracy with each other, as well as under color of law and within

the scope of their employment, used fabricated evidence to accuse Burrell of criminal activity and detain him without probable cause.

148.     In so doing, the Police Officer Defendants and Prosecutor Defendants caused Burrell to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment. Specifically, Burrell's liberty was limited from the date of his arrest until nearly twenty-years later.

149.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's innocence.

150.     As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

151.     The misconduct described in this Count by Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

152.     Each paragraph of this Complaint is incorporated as if restated fully herein.

153.     As described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Police Officer Defendants and Prosecutor Defendants stood by without intervening to prevent the violation of Burrell's constitutional rights, even though they had the opportunity to do so.

154.     The Police Officer Defendants and Prosecutor Defendants had a reasonable opportunity to prevent this harm but failed to do so.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to Burrell's clearly established constitutional rights.

156. As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

157. The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**COUNT IV – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

158. Each paragraph of this Complaint is incorporated as if restated fully herein.

159. In investigating the murders of Renee Battle and attempted murder of Marc Davis, the Police Officer Defendants and Prosecutor Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Burrell of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

160. Additionally, before and after Burrell's conviction, the Police Officer Defendants and Prosecutor Defendants further conspired to deprive Burrell of favorable information to which he was lawfully entitled and which would have led to either not being charged, acquittal, or faster exoneration.

161. In this manner, the Police Officer Defendants and Prosecutor Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

27

162.    In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, and coercing false statements—and was an otherwise willful participant in joint activity.

163.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

164.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Burrell's clear innocence.

165.    The misconduct by the Police Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

## COUNT V – 42 U.S.C. § 1983
## Policy and Practice Claim against Defendant City of Chicago

166.    Each paragraph of this Complaint is incorporated as if fully restated herein.

167.    As described in detail above, Defendant City of Chicago is liable for the violation of Burrell's constitutional rights because his injuries were caused by the policies, practices, and customs of the City, as well as by the actions of final policymakers for the City.

168.    At all relevant times and for a period of time prior thereto, the City and its final policymakers promulgated policies and procedures for the techniques to be used when questioning criminal suspects; the conduct of line-ups and other identification procedures; obtaining witness statements; retention of evidence; and the production of information in a criminal case.

169.     These policies and procedures were implemented by officers of the CPD, including the Police Officer Defendants who were responsible for interrogating suspects and witnesses in connection with the Battle homicide investigation.

170.     At all relevant times and for a period of time prior thereto, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for: the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; maintenance of investigative files and disclosure of those files in criminal proceedings; disclosure of exculpatory and/or impeaching evidence; the collection, documentation, preservation, and testing of evidence; and conducting photographic and live lineup procedures. The City and its final policymakers failed to promulgate adequate policies or procedures on these topics (although the need for such policies and procedures was obvious, given the recurring situations faced by officers) in order to prevent the violation of citizens' constitutional rights.

171.     In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for training and supervision of CPD officers on these topics.

172.     The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the CPD and the City.

173.     At all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, under which criminal suspects were deprived of exculpatory evidence pertaining to how eyewitness procedures were administered and/or how witnesses came to make "statements" against criminal defendants. This practice of suppression of evidence includes not only the City's "street file" practices but also other instances—in dozens of cases—where witnesses statements were fabricated in various ways, including false promises, threats, coercion, physical violence, etc.

174. In addition, at all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

175. At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. This includes widespread practices and customs under which individuals suspected of criminal activity, such as Burrell, were routinely deprived of their right to due process rights. For instance, it was common that suspects were prosecuted based fabricated evidence, including fabricated eyewitness statements or identifications, and that exculpatory and impeaching evidence was suppressed.

176. At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of widespread practices and customs under which individuals suspected of criminal activity, like Burrell, were routinely convicted despite their innocence. It was common for witnesses and suspects interrogated by the CPD to provide false statements, implicating others or implicating themselves in crimes.

177. The widespread practices and customs described above, individually and together, were allowed to flourish because the leaders, supervisors, and final policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers on these topics, and by failing

to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Burrell.

178. The above-described widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because final policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

179. In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Burrell were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

180. The Police Officer Defendants acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint. Burrell's injuries were directly and proximately caused by the City's policies, widespread practices, and customs.

181. Specifically, Burrell's injuries were caused by the policies, widespread practices, and customs of the City in that officers and employees of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced suspect and witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated constitutional rights in a manner similar to that alleged here.

182. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City declined to implement sufficient training and any legitimate

mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and suspect or witness statements, and pursued wrongful convictions.

183.    Indeed, the CPD's systems for investigating and disciplining police officers accused of the type of misconduct that affected Burrell were and are, for all practical purposes, nonexistent. The CPD maintained a code of silence that effectively eliminated any form of accountability, discipline, or oversight.

184.    Chicago police officers who manufactured criminal cases against individuals like Burrell had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter the cost. In this way, the City proximately caused abuses like the Police Officer Defendants' misconduct at issue in this case.

185.    As a direct and proximate result of Defendant City's policies, widespread practices, and customs, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VI – State Law Claim
### Malicious Prosecution

186.    Each paragraph of this Complaint is incorporated as if restated fully herein.

187.    The Police Officer Defendants and Prosecutor Defendants, acting as investigators, accused Burrell of criminal activity, knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

188.    The Police Officer Defendants and Prosecutor Defendants caused Burrell to be improperly subjected to judicial proceedings for which there was no probable cause.

189. These judicial proceedings were instituted and continued maliciously, resulting in injury.

190. Statements, including reports, of the Police Officer Defendants and Prosecutor Defendants regarding Burrell's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, and withheld exculpatory evidence that would have demonstrated Burrell's absolute innocence, destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

191. The Police Officer Defendants and Prosecutor Defendants were aware that, as described more fully above, no true or reliable evidence implicated Burrell in the murder of Renee Battle.

192. The Police Officer Defendants and Prosecutor Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Burrell, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Burrell and continue to do so even to this day.

193. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in disregard of the truth and Burrell's innocence.

194. The prosecution terminated in Burrell's favor when all charges against him were dismissed.

195. As a direct and proximate result of Defendants' misconduct, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VII – State Law Claim
## Intentional Infliction of Emotional Distress

196.     Each paragraph of this Complaint is incorporated as if restated fully herein.

197.     The acts and conduct of the Police Officer Defendants and Prosecutor Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause—or were in reckless disregard of the probability that their conduct would cause—severe emotional distress to Burrell, as is more fully alleged above.

198.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's clear innocence.

199.     As a direct and proximate result of Defendants' misconduct, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

## COUNT IX – State Law Claim
## Civil Conspiracy

200.     Each paragraph of this Complaint is incorporated as if restated fully herein.

201.     As described above, the Police Officer Defendants and Prosecutor Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Burrell for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Burrell of these rights.

202.     In furtherance of the conspiracy, the Police Officer Defendants and Prosecutor Defendants committed overt acts and were otherwise willful participants in joint activity including,

but not limited to, the malicious prosecution of Burrell and the intentional infliction of emotional distress upon him.

203.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's clear innocence.

204.    As a direct and proximate result of Defendants' conspiracy, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**COUNT X – State Law Claim**
**Willful and Wanton Conduct**

205.    Each paragraph of this Complaint is incorporated as if fully restated herein.

206.    At all times relevant herein, the Police Officer Defendants and Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Battle murder investigation.

207.    As described herein, it was foreseeable to the Police Officer Defendants and Prosecutor Defendants, fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Burrell, would inevitably result in extreme harm to him. Avoiding this injury to Burrell would not have burdened The Police Officer Defendants and Prosecutor Defendants in any way.

208.    Notwithstanding that duty, the Police Officer Defendants and Prosecutor Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Burrell's rights.

209.    As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT XI – State Law Claim
### *Respondeat Superior*

210.    Each paragraph of this Complaint is incorporated as if restated fully herein.

211.    In committing the acts alleged above, each of the Police Officer Defendants were members and agents of the CPD, acting at all relevant times within the scope of their employment and under color of law.

212.    Defendant City of Chicago is liable as principal for all torts committed by its agents under state law.

213.    In committing the acts alleged in the preceding paragraphs, the Prosecutor Defendants were employees and agents of CCSAO, acting at all relevant times within the scope of his employment and under color of law.

214.    Defendant Cook County is liable for torts committed by its agents under state law.

## COUNT XII – State Law Claim
### Indemnification

215.    Each paragraph of this Complaint is incorporated as if restated fully herein.

216.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

217.    The Police Officer Defendants are or were employees of the CPD, who acted within the scope of their employment in committing the misconduct described herein.

218.    Defendant City of Chicago is responsible for paying any judgment entered against the Police Officer Defendants. Burrell therefore demands judgment against Defendant City of

Chicago in the amounts awarded to Burrell against the individual Police Officer Defendants as damages, attorneys' fees, costs, and interest.

219.    The Prosecutor Defendants were employees of CCSAO, who acted within the scope of their employment in committing the misconduct described herein.

220.    Cook County is responsible for paying any judgment entered against the Prosecutor Defendants. Burrell therefore demands judgment against Defendant Cook County in the amounts awarded to Burrell against the Prosecutor Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff FRANK BURRELL respectfully requests that this Court enter a judgment in his favor against Defendants ALBERT GRAF, ROGER MURPHY, MICHAEL QUALLS, WILLIAM GROELLER, TIMOTHY NOLAN, DANIEL MCNALLY, FREDERICK O. BONKE, the CITY OF CHICAGO, MARIA KURIAKOS, PAUL KARLOVICS, and COOK COUNTY, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individually named Defendants, pre- and post-judgment interest, equitable and injunctive relief against the CITY OF CHICAGO, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Frank Burrell hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

FRANK BURRELL

BY: /s/ Fatima Ladha
 *One of Plaintiff's Attorneys*

Jon Loevy
Fatima Ladha
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
O: 312.243.5900
ladha@loevy.com
*Attorneys for Plaintiff*