**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

FRANK BURRELL,       )
      )
      Plaintiff,       )
      )     Case No. 25-CV-02238
v.       )
      )
ALBERT GRAF, ROGER MURPHY,       )     District Judge Sunil R. Harjani
MICHAEL QUALLS, WILLIAM GROELLER,   )
TIMOTHY NOLAN, DANIEL MCNALLY,    )     Magistrate Judge Maria Valdez
FREDERICK O. BONKE, the CITY OF      )
CHICAGO, MARIA KURIAKOS, PAUL     )     **JURY TRIAL DEMANDED**
KARLOVICS, and COOK COUNTY,      )
      )
      Defendants.      )

<u>**DEFENDANTS MARIA KURIAKOS AND PAUL KARLOVICS' ANSWER AND**</u>
<u>**AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**</u>

Defendants, Maria Kuriakos (n/k/a Maria Kuriakos-Ciesil) and Paul Karlovics (collectively "Defendant Prosecutors"), by and through their undersigned counsel for their Answer and Affirmative Defenses to Plaintiff's Complaint, states as follows:

**INTRODUCTION**

1. Plaintiff Frank Burrell was in the formative years of his 20s when he was arrested, prosecuted, and ultimately wrongfully convicted for the 1999 murder of Renee Battle.

    <u>**ANSWER:**</u>   **Defendant Prosecutors deny the allegations in paragraph 1 of Plaintiff's Complaint.**

2. Ms. Battle was killed as the result of a tragic, high-profile drive-by shooting in Hyde Park, Chicago. By all accounts, the shooters were targeting the car because Ms. Battle's then-boyfriend, Marc Davis, was the driver.

    <u>**ANSWER:**</u>   **Defendant Prosecutors admit that Renee Battle was shot and killed by Plaintiff in a drive-by shooting in Chicago. Defendant Prosecutors deny that there was multiple "shooters." Defendant Prosecutors deny the truth of the remaining allegations in paragraph 2 of Plaintiff's Complaint.**

3.      Burrell had nothing to do with the crime. Not one piece of physical or forensic evidence connected him to the murder.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 3 of Plaintiff's Complaint.**

4.      Nonetheless, Burrell was arrested, tried, and convicted of crimes he did not commit as a result of the misconduct of Chicago Police Department officers, and other officials, who fabricated evidence against Burrell while suppressing information that would have prevented the prosecution and conviction in the first place.

**ANSWER:    Defendant Prosecutors admit Plaintiff was arrested, tried, and convicted for the crimes he committed, which included the murder of Renee Battle. Defendant Prosecutors deny the remaining allegations in paragraph 4 of Plaintiff's Complaint.**

5.      Defendants' misconduct caused Plaintiff to be convicted following a criminal trial and he was wrongfully imprisoned until 2019, when he was released. Even then, Mr. Burrell was not free—his liberty was restricted, he was subject to a cloud of criminal charges, and he was branded a murderer until the charges were finally dismissed in 2024.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 5 of Plaintiff's Complaint.**

6.      The more than two-decades-long saga of wrongful murder charges caused Mr. Burrell tremendous harm. He missed out on precious time with family and friends and spent time in Illinois prisons where he endured violence and the constant struggle of knowing he might spend the rest of his life carrying the label of "murderer" for a crime he did not commit.

**ANSWER:    Defendant Prosecutors deny Plaintiff was wrongfully charged with murder and deny the remaining allegations in paragraph 6 of Plaintiff's Complaint.**

7.      Burrell's wrongful conviction was no accident. Nor was it an isolated incident. Instead, the misconduct that caused Burrell's wrongful conviction is part and parcel of the policies, practices, and customs of the Chicago Police Department, and thus the City of Chicago.

**ANSWER:** **Defendant Prosecutors deny Plaintiff was wrongfully convicted and deny the remaining allegations in paragraph 7 of Plaintiff's Complaint.**

8.     Burrell now brings this lawsuit seeking redress for the devastating injuries he endured and continues to suffer because of Defendants' misconduct and to hold accountable those who caused this tragedy.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 8 of Plaintiff's Complaint.**

## JURISDICTION AND VENUE

9.     This action is brought pursuant to the United States Constitution, 42 U.S.C. § 1983, and Illinois law to redress Defendants' tortious conduct and the deprivation of Plaintiff's rights.

**ANSWER:** **Defendant Prosecutors admit that the Plaintiff brought this suit pursuant to 42 USC § 1983 and Illinois law but deny the remaining allegations in paragraph 9 of Plaintiff's Complaint.**

10.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C § 1331 and it has jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

**ANSWER:** **Defendant Prosecutors admit the allegations in paragraph 10 of Plaintiff's Complaint.**

11.     Venue is appropriate in this district because the events underling this suit took part in Cook County, Illinois, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. 28 U.S.C. § 1391(b).

**ANSWER:** **Defendant Prosecutors admit that venue is proper in this judicial district as Plaintiff's arrest, criminal prosecution and trial that resulted in Plaintiff's conviction occurred within this judicial district. Defendant Prosecutors deny the remaining allegations of paragraph 11.**

## PARTIES

12.     Plaintiff Frank Burrell is a resident of Cook County, Illinois. He spent nearly two decades wrongfully imprisoned for crimes he did not commit. Now free, Burrell spends his time with family and working to rebuild his life.

3

**ANSWER:** **Defendant Prosecutors deny Plaintiff spent nearly two decades wrongfully imprisoned for crimes he did not commit. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 12 of Plaintiff's Complaint.**

13.     At all times relevant to the events described in this complaint, Defendants Albert Graf (Star #20480), Roger Murphy (Star #20681), Michael Qualls, Daniel McNally, Timothy Nolan, William Groeller, and other unknown law enforcement officers (together, the "Police Officer Defendants") were officers with the Chicago Police Department (CPD) who acted under the color of law and within the scope of their employment.

**ANSWER:** **Defendant Prosecutors admit that these defendants were members of the Chicago Police Department but lack knowledge or information sufficient to form a belief about the truth of whether these defendants were members of the Chicago Police Department at all relevant times. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 13 of Plaintiff's Complaint.**

14.     At all times relevant to the events described in this complaint, Defendant Frederick O. Bonke, and other unknown law supervisory officers of the CPD were supervisors of the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Police Officer Defendants whom they supervised.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 14 of Plaintiff's Complaint.**

15.     Defendant City of Chicago is a municipality and was or is the employer of each Police Officer Defendants. The City of Chicago is liable for the Police Officer Defendants' misconduct while acting within the scope of their employment for the City. The City of Chicago is liable for all torts committed by the Police Officer Defendants' while employed by the City of Chicago pursuant to the doctrine of *respondeat superior*. Defendant City of Chicago is additionally responsible for the policies and practices of the CPD.

4

**ANSWER:** **Defendant Prosecutors admit that the City of Chicago is an Illinois Municipal Corporation but lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 15 of Plaintiff's Complaint.**

16. At all times relevant to the events described in this complaint, Defendants Maria Kuriakos and Paul Karlovics (Prosecutor Defendants) were Assistant State's Attorney's for the Cook County State's Attorney's Office (CCSAO). These Defendants worked with the Police Officer Defendants—while acting in an investigatory capacity, under the color of law, and within the scope of their employment—to conceal and fabricate evidence, manipulate witness testimony, obtain false statements, and maliciously prosecute Plaintiff for Renee Battle's murder.

**ANSWER:** **Defendant Prosecutors admit that at all relevant times Defendants were Assistant State's Attorneys of Cook County acting under color of law and in the course and scope of their employment. Defendants deny the remaining allegations in paragraph 16 of Plaintiff's Complaint.**

17. Defendant Cook County is a county in Illinois that employed the Prosecutor Defendants. The County has *respondeat superior* liability for the Prosecutor Defendants' tortious acts under state law and is obligated to indemnify them.

**ANSWER:** **Defendant Prosecutors deny that they engaged in or are liable for any tortious acts, but admit remaining the allegations in paragraph 17 of Plaintiff's complaint.**

18. Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

**ANSWER:** **At all relevant times, Defendant Prosecutors were acting under the color of law and in scope of their employment. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 18 of Plaintiff's Complaint.**

## FACTS

### The Murder of Renee Battle and Attempted Murder of Marc Davis

19.    On the evening of July 7, 1999, Renee Battle her boyfriend, Marc Davis, and their 8-year-old son were driving home after spending time at the beach on Lake Michigan. It was nighttime.

   **ANSWER:    Defendant Prosecutors admit that on the evening of July 7, 1999, Marc Davis was driving his car with his then girlfriend Renee Battle, and Marc Davis's 8-year-old son both in the vehicle. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 19 of Plaintiff's Complaint.**

20.    Davis was driving his car, a 1996 green Chevy Tahoe, while Ms. Battle was in the passenger seat, and the child was in the back seat.

   **ANSWER:    Defendant Prosecutors admit the allegations in Paragraph 20 of Plaintiff's Complaint.**

21.    Davis's green Tahoe was well known to people in the community. At the time, Marc Davis was involved with the Black Stones street gang, and his car was well-known given his rank and activity within the gang.

   **ANSWER:    Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of Plaintiff's Complaint.**

22.    Davis was driving his green Tahoe on 51st Street in Hyde Park, Chicago and was preparing to stop at a four-way stop sign at the intersection of Blackstone Ave and 51st Street.

   **ANSWER:    Defendant Prosecutors admit the allegations in paragraph 22 of Plaintiff's Complaint.**

23.    As Davis approached the intersection and was preparing to stop, another car pulled up on the passenger side of the Tahoe.

   **ANSWER:    Defendant Prosecutors admit the allegations in paragraph 23 of Plaintiff's Complaint.**

24.    Davis would later describe this car as an older, silver, and as having four doors.

**ANSWER:** Defendant Prosecutors admit that a description Marc Davis did provide of the car was an older model four door silver mid-sized vehicle. Defendant Prosecutors deny the remaining allegations in paragraph 24 of Plaintiff's Complaint.

25.     That car pulled up and stopped in front of the right passenger side of Davis's Tahoe, as if to block him from continuing through the intersection.

**ANSWER:** Defendant Prosecutors admit the allegations in paragraph 25 of Plaintiff's Complaint.

26.     Davis did not engage with the driver of the other vehicle.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 of Plaintiff's Complaint.

27.     Instead, Davis began to proceed through the intersection but the other vehicle pulled to the side/front of Davis's Tahoe, again as if to block him from continuing down the road.

**ANSWER:** Defendant Prosecutors admit the allegations in paragraph 27 of Plaintiff's Complaint.

28.     Rather than trying to block Davis, the other car veered to the right and shot into Davis's Tahoe—from the passenger side toward Davis.

**ANSWER:** Defendant Prosecutors admit that Plaintiff shot into the passenger window of Marc Davis's vehicle towards both him and Renee Battle. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 28 of Plaintiff's Complaint.

29.     While simultaneously driving the Tahoe and hearing the shots, Davis ducked down and tried to get his son down as well.

**ANSWER:** Defendant Prosecutors admit that upon hearing gunshots, Marc Davis ducked down and reached to the rear seat and pushed his son down to the floor as well. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 29 of Plaintiff's Complaint.

30.     Both Davis and his son were unscathed.

**ANSWER:** Defendant Prosecutors admit that neither Marc Davis nor his son were struck by Plaintiff's gunfire on July 7, 1999. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 30 of Plaintiff's Complaint.

7

31.     Tragically, however, Ms. Battle was shot in the head.

**ANSWER:     Defendant Prosecutors admit the allegations in paragraph 31 of Plaintiff's Complaint.**

32.     The vehicle completed its right turn and drove northbound on Blackstone Ave.

**ANSWER:     Defendant Prosecutors admit Plaintiff's vehicle turned right and drove northbound on Blackstone Ave. following the shooting.**

33.     Davis drove Ms. Battle to the hospital; she died from her injuries around midnight.

**ANSWER:     Defendant Prosecutors admit the allegations in paragraph 33 of Plaintiff's Complaint.**

34.     The CPD investigated the crime, and police presence was thorough and swift. The shooting happened just a few minutes away from a large police station at 51st and Wentworth, a facility that housed police officers, tactical officers, and the Area One Detective Division.

**ANSWER:     Defendant Prosecutors admit that CPD investigated the crime. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 26 of Plaintiff's Complaint.**

35.     Defendants, then detectives, Al Graph and Roger Murphy began investigating that night. Defendant Michael Qualls, then a CPD tactical officer, was also assigned to the case. In addition, Defendant Groeller, also a detective at the time, was assigned to work the case.

**ANSWER:     Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35 of Plaintiff's Complaint.**

36.     That night, Davis told police—including Defendants Graph, Murphy—about the shooting. Davis was extremely cooperative.

**ANSWER:     Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 36 of Plaintiff's Complaint.**

37.     In so doing, Davis honestly told police the car where the shots came from was an older model, was silver, had four doors, did not have license plates, and had an orange license applied for sticker in the rear window.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37 of Plaintiff's Complaint.

38.     Davis also told police that he could not identify how many people were in the silver four-door car that had shot at him.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 of Plaintiff's Complaint.

39.     Based upon Davis's statements, and their canvas, CPD officers located a car they thought may have fit the description of the car from which the shots were fired. That car was a four-door Chevy Celebrity with an orange license applied for sign in the rear window.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of Plaintiff's Complaint.

40.     Davis traveled with CPD officers, including Defendants Graf and Qualls, to where the car was found to view the Chevy Celebrity. Davis told investigators that car was similar to the one involved in the shooting.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 of Plaintiff's Complaint.

41.     The CPD officers found the owner of the Chevy Celebrity, but concluded he was not involved in the shooting.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 of Plaintiff's Complaint.

42.     Davis did not know the person who tried to kill him and that killed his girlfriend.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 42 of Plaintiff's Complaint.

43.     As a result, the only information he could provide was that he believed the shooter put their arm out of the window of the car, and that the perpetrator was light skinned, black, and approximately in their 20s.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 43 of Plaintiff's Complaint.

44.     With Defendants Graph and Murphy as the lead detectives, numerous CPD officers worked to respond to the shooting. Among other things, Defendants Graf, McNally, Nolan, and Murphy investigated the scene of the crime and canvassed the neighborhood after the shooting but were unable to discover information about the identity of the shooter.

**ANSWER:** Defendant Prosecutors admit Detective Graf and Murphy were two of the detectives working on the Battle murder investigation. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 44 of Plaintiff's Complaint.

### Burrell Is Innocent

45.     The shooting of Renee Battle was horrific and stunning.

**ANSWER:** Defendant Prosecutors admit the allegations in paragraph 45 of Plaintiff's Complaint.

46.     Frank Burrell had absolutely nothing to do with the crime.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 46 of Plaintiff's Complaint.

47.     No evidence pointed to this shooting having anything to do with Burrell.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 47 of Plaintiff's Complaint.

48.     In addition, Burrell knew Davis and Davis knew Burrell. Though they were not close at the time of the shooting, Davis and Burrell knew one another very well. Davis knew Burrell's full name and some of his family members.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48 of Plaintiff's Complaint.

49.     Yet, in the aftermath of the crime—when Davis was willing to ride in a police car to search for the perpetrator—Davis did not say or suggest that it was Burrell who had committed the crime.

10

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49 of Plaintiff's Complaint.

50. Burrell could not have committed the crime, either. For one, Burrell did not have a car, let alone a silver four-door car as described by Davis.

**ANSWER:** Defendant Prosecutors deny that Plaintiff could not have committed the crime or that he was not inside a car when he shot and murdered Battle. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 50 of Plaintiff's Complaint.

51. In addition, Burrell worked at a film studio in July 1999. Burrell worked the day of the Battle shooting. Burrell had gone to work, completed his janitorial work, and took public transit home. As a result, in addition to the fact that he *did not* commit the crime, Burrell *could not* have committed the crime—he was not at or near 51st and Blackstone that evening.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of whether Plaintiff worked at a film studio in July, 1999. Defendant Prosecutors deny the remaining allegations in paragraph 51 of Plaintiff's Complaint.

### *Defendants Fabricate that Burrell Was Involved In The Shooting*

52. After the shooting, Davis tried to figure out who had shot at him—he wanted to know if it was a "sanctioned" gang hit or something else.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52 of Plaintiff's Complaint.

53. To that end, Davis had meetings with gang members, and even non-gang members discussing the fact that he did not know who had tried to kill him and who had killed his girlfriend.

**ANSWER:** Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53 of Plaintiff's Complaint.

54. There was tremendous pressure on Davis, and on the CPD, to "close" this case. Understandably, Ms. Battle's family wanted to know how something so shocking could happen to their family. Davis knew that the perpetrator (or perpetrators) were after him, and so felt obligation

11

to Ms. Battle's family to atone for Battle being killed because of him. In addition, a drive-by shooting out of nowhere in Hyde Park near the beach and on the same street as a major police station put tremendous pressure on the Police Officer Defendants to solve the case.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 54 of Plaintiff's Complaint.**

55.     Weeks passed with Police Officer Defendants developing no information that connected Plaintiff in any way to this shooting.

**ANSWER:** **Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55 of Plaintiff's Complaint.**

56.     Defendant Qualls, who had gone to high school with Davis and Battle, was in communication with Davis in the two-three weeks after the murder. Consistent with the fact he did not know who the shooter was, Davis did not identify a particular person as the perpetrator or ever say that he knew the number of people in the silver car.

**ANSWER:** **Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 56 of Plaintiff's Complaint. Defendant Prosecutors deny the remaining allegations in paragraph 56 of Plaintiff's Complaint.**

57.     At some point at or near the end of July 1999, the Police Officer Defendants, including Groeller, Graph, Murphy, and Qualls, decided to put the murder on Burrell.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 57 of Plaintiff's Complaint.**

58.     In a manner that Defendants still have not disclosed to this very day, Defendants enlisted Marc Davis as part of the fabrication.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 58 of Plaintiff's Complaint.**

59.     Though the claims were false, in August 1999, Defendants wrote reports saying that Davis indicated he knew who the shooter was but that he did not know the person's actual

name and only had a nickname of "Akbar." According to the fabricated reports, it was at this point—and not before—that they were able to "solve" the identity issue when Defendant Groeller informed Davis and Defendants Qualls, Graph, and Murphy that "Akbar" was actually Frank Burrell.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 59 of Plaintiff's Complaint.

60. Of course, and in reality, this entire narrative was false.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 60 of Plaintiff's Complaint.

61. For one, Burrell did not commit the crime. In addition, Davis and the officers knew Frank Burrell's name before August 1999, and they knew that Davis could not possibly identify someone involved in the shooting a month after the fact. Defendants' reports are written to obscure and hide these facts, and Defendants have never disclosed the extent of their misconduct.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 61 of Plaintiff's Complaint.

62. The notion that Davis could suddenly turn an about-face and "identify" the shooter was obviously preposterous. In addition, the idea that Davis would need to see a lineup or photo array to identify Burrell was also complete farce.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 62 of Plaintiff's Complaint.

63. Nonetheless, the Police Officer Defendants, including Graph, Murphy, Qualls, and Groeller, wrote and/or contributed to reports purporting to memorialize, and solidify, the fake "identification."

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 63 of Plaintiff's Complaint.

13

64.    Given the obviously flawed (and fabricated) idea that Davis could "identify" Burell as the shooter, Defendants and Davis fabricated additional evidence. For example, though the extent of their efforts have not been disclosed to this very day, Defendants wrote reports saying that Davis told Groeller he could now identify that there were three people in the car. In addition to naming Burrell (as Akbar), the police claim, Davis told Defendant Groeller that, coincidentally enough, Davis also knew the names of theses previously unknown suspects—Marshawn Hatcher, and Jerry Morton.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 64 of Plaintiff's Complaint.**

65.    In fabricating additional evidence, Defendants Qualls, Murphy, Groeller, and Graph enlisted additional law enforcement officers to attempt to make it seem as though the wholly bogus story that Davis could identify Hatcher and Morton (and Burrell), and that Hatcher and Davis saw Burrell commit the shooting.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 65 of Plaintiff's Complaint.**

66.    Morton and Hatcher never saw Burrell commit the shooting, as they could not have seen Burrell do something he never did.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 66 of Plaintiff's Complaint.**

67.    Nonetheless, in statements fabricated by the Police Officer Defendants and the Prosecutor Defendants, and via acts of either coercion and false promises, Morton and Hatcher provided fabricated accounts suggesting that Burrell had been driving around with them for hours that day, drinking and getting high, and shot Davis, conveniently without them having any knowledge of their being a gun in the car or any knowledge that Burrell, who they claimed was driving, was going to shoot at someone.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 67 of Plaintiff's Complaint.

68.     In 1999, Chicago Police Department Officers worked hand-in-hand with members of the Cook County State's Attorney's Office investigating cases before charges were filed. In this role, prosecutors worked as part of the "Felony Review Unit" (FRU) but conducted their work in police station, on the street, or other locations along with police—not as advocates for the State of Illinois in Court.

**ANSWER:** Defendant Prosecutors admit that at all relevant times, they were assigned to the Felony Review Unit of the Cook County State's Attorney's Office. Defendant Prosecutors deny the remaining allegations in paragraph 68 of Plaintiff's Complaint.

69.     Here, Defendants Kuriakos and Karlovics were both FRU prosecutors and involved in the investigation of the murder of Renee Battle and attempted murder of Marc Davis in such a capacity.

**ANSWER:** Defendant Prosecutors admit that at all relevant times, they were assigned to the Felony Review Unit of the Cook County State's Attorney's Office. Defendant Prosecutors deny the remaining allegations in paragraph 69.

70.     In addition to fabricating information in police reports, Defendants' efforts included fabricating written statements that Morton and Hatcher signed.

    a.     For Morton, the police reports and "statements," which included obviously false and outlandish information, were generated by the work of Defendants Tim Nolan, Daniel McNally, and former ASA Paul Karlovics, who traveled to McLean County to speak with Morton as an investigator alongside the police. Among other things, these false statements were prompted by promises of lenient treatment on Morton's other criminal cases.

    b.     For Hatcher, the police reports and "statements," included obviously false and outlandish information, were generated by the work of Defendants Graf, Qualls, and former ASA Maria Kuriakos, who traveled to Area One Detective Division to speak with Hatcher alongside the police. Defendants knew that Hatcher's statements were both untrue and the result of misconduct (the full extent they still have yet to fully disclose), and so had him sent to the grand jury as a mechanism of trying to preserve as much of the fabrication as they could once out of police custody. Among other things, Hatcher was subject to violence and other misconduct in prompting

him to sign to the fabricated account, which Defendants were able to exercise greater control over than Morton because Hatcher was in Chicago.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 70, including subsections a through b, of Plaintiff's Complaint.**

71. On the basis of entirely fabricated evidence, Defendants then had Burrell arrested. Defendant Qualls effectuated the arrest, and wrote untrue statements in his report about how the arrest occurred. In particular, Defendant Qualls made it seem as if Burrell was trying to flee the police due to some sort of guilty conscience for the Battle shooting; an insinuation that is completely false.

**ANSWER:** **Defendant Prosecutors admit that Plaintiff, while attempting to flee from police, was arrested by members of the Chicago Police Department on an arrest warrant for the murder of Renee Battle. Defendant Prosecutors deny the remaining allegations in paragraph 71 of Plaintiff's Complaint.**

72. Even still, Defendants knew that there was no probable cause to believe Burrell committed the crime and that they would need to try to sure-up their bogus case. In fabricating further evidence, Defendants had Davis come to the police station to "identify" Burrell from a live lineup, as if Davis did not know Burrell and as if Defendants and Davis had not already agreed to point the finger at him.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 72 of Plaintiff's Complaint.**

73. Knowing that documenting their misconduct, and what actually occurred would doom any prosecution, Defendants either (1) refused to memorialized the entirety of their conversations with Davis or (2) memorialized their conversations with Davis in police reports that were either destroyed or, at minimum, remain hidden to this day.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 73 of Plaintiff's Complaint.**

74.     The police reports the Police Officer Defendants created are irregular and include obvious gaps and flaws, owing to the fact they are fabricated and part and parcel of masking the misconduct that prompted a bogus case against Burrell for a crime he did not commit.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 74 of Plaintiff's Complaint.**

75.     Defendants knew prosecuting Burrell would be problematic—there was no murder weapon, they knew that Burrell worked at the film studio, and they did not even have a suspect vehicle. As a result, rather than admitting their misconduct, Defendants fabricated the notion that Burrell could have committed the crime by driving his grandmother's car. Defendants knew this was false. Burrell's grandmother's car did not fit the description provided by Davis of the perpetrator's vehicle; it had two-doors, not four; it was white not silver; it had license plates; it did not have an orange sticker in the window; and Burrell did not have access to the car.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 75 of Plaintiff's Complaint.**

76.     The Police Officer Defendants worked directly under the supervision of Defendant Frederick Bonke. Bonke signed off on nearly every fabricated report authored in this case and was, therefore, a participant in the generation of this evidence against Burrell.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 76 of Plaintiff's Complaint.**

**Despite His Innocence, Burrell Is Wrongfully Convicted**

77.     As a result of Defendants' work, Burrell was charged with murder and attempted murder for crimes he did not commit.

**ANSWER:     Defendant Prosecutors admit that Plaintiff was charged with murder, attempted murder. Defendant Prosecutors deny the remaining allegations in paragraph 77 of Plaintiff's Complaint.**

78.     Before Davis claimed to "identify" Burrell there was no probable cause to suspect Plaintiff of the murder.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 78 of Plaintiff's Complaint.**

79.     After Davis claimed to "identify" Burrell there was no probable cause to suspect Plaintiff of the murder.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 79 of Plaintiff's Complaint.**

80.     Before Hatcher and Harris were interviewed, there was no probable cause to suspect Plaintiff of the murder.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 80 of Plaintiff's Complaint.**

81.     After Hatcher and Harris were interviewed, there was no probable cause to suspect Plaintiff of the murder.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 81 of Plaintiff's Complaint.**

82.     Nonetheless, Burrell was charged and the matter proceeded to trial based on entirely fabricated evidence. Before trial, the CCSAO relied upon the police reports and handwritten "statements" in charging Burrell, in preparing its case before trial, and in making strategic decisions in the case. At trial, the fabricated reports and "handwritten" statements impacted the proceedings, and were used by the prosecutors and defense attorneys and in the examination of witnesses.

**ANSWER:     Defendant Prosecutors deny the allegations in paragraph 82 of Plaintiff's Complaint.**

83. The content of the fabricated reports—including that Davis identified Burrell almost a month after the crime and that Hatcher and Morton were there, too—were part of the evidence used at trial.

**ANSWER: Defendant Prosecutors deny the allegations in paragraph 83 of Plaintiff's Complaint.**

84. At no point before the trial, or even after, did Defendants disclose the favorable evidence they had about Burrell, including their own misconduct, their own fabrications, and the entire circumstances behind how Burrell was made a suspect in the first place.

**ANSWER: Defendant Prosecutors deny they engaged in misconduct or fabricated evidence and further deny the remaining allegations in paragraph 84 of Plaintiff's Complaint.**

85. Despite his innocence, with fabricated evidence used against him and favorable information suppressed, Burrell was wrongfully convicted and imprisoned.

**ANSWER: Defendant Prosecutors deny the allegations in paragraph 85 of Plaintiff's Complaint.**

86. It took decades for Burrell to secure his freedom. In 2019, some twenty years after this ordeal began, the Court of Appeals vacated Burrell's conviction following the presentation of evidence that he could not have committed the crime because he was working at the film studio when Hatcher and Morton falsely claimed Burrell was riding around with them drinking and getting high in the run-up to the shooting.

**ANSWER: Defendant Prosecutors admit the Illinois Court of Appeals vacated Plaintiff's conviction. Defendant Prosecutors deny the remaining allegations in paragraph 86 of Plaintiff's Complaint.**

87. Even then, the weight of the fabricated evidence and suppression of favorable evidence continued to cause Burrell harm. Burrell spent the next nearly five years under indictment and facing a retrial. In this time, Burrell was on bond and faced continued restrictions on his liberty.

**ANSWER:** **Defendant Prosecutors admit Plaintiff was out on cash bond subsequent to his conviction being vacated in October 2019, and that his criminal case was continued for retrial through March 2024. Defendant Prosecutors deny the remaining allegations in paragraph 87 of Plaintiff's Complaint.**

88.     Finally, with retrial set to commence for a third time in as many weeks, the State

moved to dismiss the charges against Burrell in March 2024.

**ANSWER:** **Defendant Prosecutors admit the State dismissed the charges against Plaintiff in March 2024. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 88 of Plaintiff's Complaint.**

### The City of Chicago's Policies and Customs Caused
### Burrell to be Wrongfully Convicted

89.     The City is responsible, by virtue of its policies, practices, and customs, for

inflicting miscarriages of justice in scores of incidents like the one Burrell endured.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 89 of Plaintiff's Complaint.**

90.     Since 1982, over 150 cases have come to light in which Chicago police officers

fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an

innocent person for serious crimes they did not commit.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 90 of Plaintiff's Complaint.**

91.     In these cases, CPD officers used the same or similar tactics Police Officer

Defendants employed against Burrell here, including fabricating evidence or suppressing material

information.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 91 of Plaintiff's Complaint.**

92.     At all relevant times, members of the CPD, including the Police Officer Defendants, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

**ANSWER:**     **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 92 of Plaintiff's Complaint.**

93.     As a matter of widespread custom and practice, members of the CPD, including the Police Officer Defendants, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

**ANSWER:**     **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 93 of Plaintiff's Complaint.**

94.     The City's practices are myriad. For example, led by Jon Burge and others under his watch at Area Two and then Area Three, CPD officers would routinely work to fabricate false statements during the late 1970s, throughout the 1980s, and into the 1990s and beyond. The City learned about these practices in 1982 when Andrew Wilson and Jackie Wilson were tortured—Andrew was tortured so badly that the jail would not even take him.

**ANSWER:**     **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 94 of Plaintiff's Complaint.**

95.     The City knew, or should have known, that these practices continued when Burge and other officers tortured Aaron Patterson and Eric Caine in 1986, with Patterson even etching into a bench he had been tortured.

**ANSWER:** Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 95 of Plaintiff's Complaint.

96.     The City knew, or should have known, that the coerced and fabricated statements practice extended beyond Areas Two and Three and beyond Burge and his closer associates into other parts of the City and involving other officers in the 1980s and 1990s.

**ANSWER:** Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 96 of Plaintiff's Complaint.

97.     For example, in 1991, Detective Kenneth Boudreau, with Detective Michael Kill, participated in the interrogation of Anthony Jakes that resulted in generation of a fabricated statement that include events that were physically impossible. Jakes was a child at the time. In 1992, Boudreau, with Burge and others, participated in the coordinated coercion of a group of Black teenagers, Damoni Clemon, Iamari Clemon, Jessee Clemon, Tremaine Green, Clinton Welton, and Diyez Owens, none of whom stand convicted despite the claim they "confessed" and the generation of multiple "statements" witnessed or authored by FRU ASAs.

**ANSWER:** Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 97 of Plaintiff's Complaint.

98.     Detective Boudreau and other CPD detectives also obtained false witness statements from Harold Hill, Peter Williams, and Dan Young. Again, it was the CPD officers who made-up the narrative that appeared in the "statements" attributed to these three. And, as in the Jakes case, the statements included claims that were physically impossible. This time, the notion that Williams committed a heinous crime with Hill and Young was totally undermined when Detectives learned that Williams was in custody when the crime happened. Rather than disclose

their misconduct and acts of fabrication, CPD officers doubled down and fabricated more evidence

and pursued the wrongful convictions of Hill and Young, both of who were later exonerated.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 98 of Plaintiff's Complaint.**

99.     The City knew, or should have known, that Detective Kriston Kato and others were

fabricating statements from people out of Area Four Detective Division, including abusing

Frederick Seaton in 1988, Michael Waslewski and Daniel Gasca in 1990, and Andre Wallace in

1994.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 99 of Plaintiff's Complaint.**

100.     Likewise, the City knew, or should have known that Detective Reynaldo Guevara

and others, based out of Area Five, were fabricating statements and suppressing information

related to "identifications" in the 1990s as well, including the dozens of people now exonerated

following Guevara's misconduct.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 100 of Plaintiff's Complaint.**

101.     The City knew, or should have known, that the pattern of fabrication and evidence

suppression extended to Area Six Detective Division, too. For example, Daniel Taylor, Deon

Patrick, Lewis Gardner, Rodney Matthews, Paul Phillips and others were coercively interrogated

in 1992 by detectives based out of Area Six.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 101 of Plaintiff's Complaint.**

102.    What happened at Area One in the 1990s was no different, and the acts were perpetuated by detectives—like the Police Officer Defendants here—at Area One included the same pattern of fabricating statements, suppressing exculpatory information, and causing wrongful convictions. For example, in 1995, Area One detectives fabricated statements they attributed to five teenagers—Harold Richardson, Vincent Thames, Michael Saunders, Terrill Swift, and Jerry Fincher. While the Fincher statement was suppressed, the other individuals were wrongfully convicted and served significant sentences before being exonerated after DNA evidence proved the confessions were false.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 102 of Plaintiff's Complaint.**

103.    The wrongful convictions of innocent persons include numerous cases in which Chicago police detectives used the very same tactics that Police Officer Defendants employed in this case. These tactics include: (a) fabricating narratives of how a crime occurred and/or how a person became a suspect; (b) the suppression and concealment of exculpatory information, including fabricated information; and (c) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting

24

an innocent person. In addition, Chicago Police Department Offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate or misleading. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 103 of Plaintiff's Complaint.**

104. At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 104 of Plaintiff's Complaint.**

105. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 105 of Plaintiff's Complaint.**

106.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Fields v. City of Chicago*, 10 C1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536, 88 Civ. 1127 (N.D. Ill.).

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 106 of Plaintiff's Complaint.**

107.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the early 2000s, including at the time of the Battle murder and investigation at issue here.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 107 of Plaintiff's Complaint.**

108.    In addition, a set of clandestine street files related to Area 5 homicides was found in the case of *Rivera v. City of Chicago*, 12 Civ. 4428 (N.D. Ill.). Those files also contained exculpatory and impeaching evidence not turned over to criminal defendants.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 108 of Plaintiff's Complaint.**

109.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Battle murder, including in the Area One Detective Division in the 1990s (which is where the *Fields* file was located and where other files were discovered hidden in the basement)

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 109 of Plaintiff's Complaint.**

110.   The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

**ANSWER:**   **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 110 of Plaintiff's Complaint.**

111.   Before and during the period in which Burrell was falsely charged with and convicted of murder, Defendant City knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct. This allowed CPD officers to commit misconduct with impunity.

**ANSWER:**   **Defendant Prosecutors deny Plaintiff was falsely charged and convicted of murder. Defendant Prosecutors further deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 111 of Plaintiff's Complaint.**

112.   The City also failed, in the years prior to Burrell's wrongful conviction, to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

   a.   How to properly preserve and document witness statements;

   b.   The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

    c.      The risks of wrongful conviction and the steps officers should take to minimize risks;

    d.      The risks of engaging in tunnel vision during investigation; and

    e.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 112, including subsections a through e, of Plaintiff's Complaint.**

113.    The need for police officers to be trained in these areas was—and remains—obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Burrell's wrongful conviction and his injuries.

**ANSWER:** **Defendant Prosecutors deny Plaintiff was wrongfully convicted. Defendants further deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 113 of Plaintiff's Complaint.**

114.    As evident in Defendant Bonke's conduct here, the CPD also failed to appropriately supervise its officers. The United States Department of Justice ("DOJ") issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training" and the deficiencies mirror those alleged here.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 114 of Plaintiff's Complaint.**

115.    Since before Burrell's arrest and continuing for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**ANSWER:** **Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack**

**knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 115 of Plaintiff's Complaint.**

116.    Numerous municipal policymakers have even admitted the code of silence exists.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 116 of Plaintiff's Complaint.**

117.    As a result of these practices of the City, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens, knowing the City's lack of discipline and supervision and its code of silence will protect them.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 117 of Plaintiff's Complaint.**

118.    Part and parcel of this history of fostering egregious misconduct, the CPD has a long history of generating fabricated accounts, including false statements from witnesses and suspects in criminal cases, which has caused wrongful convictions, described above.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 118 of Plaintiff's Complaint.**

119.    In so doing, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

**ANSWER:    Defendant Prosecutors deny that any of the defendants in this case engaged in any of the alleged misconduct involving the Plaintiff. Defendant Prosecutors lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 119 of Plaintiff's Complaint.**

120.    The practice of obtaining bogus witness statements by CPD has had, for decades, a concomitant practice involving FRU ASAs reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

**ANSWER:    Defendant Prosecutors deny the allegations in Paragraph 120 of Plaintiff's Complaint.**

121.    The process is designed to provide an air of legitimacy to the interrogation and "confession" but really is intended to make it harder for someone who has been coerced to bring the truth to light in court proceedings because they must overcome the lies of the police as well as the involvement (even if they are unaware of or not part of the coercion) of a prosecutor who will testify as a witness at trial (and who is not the CCSAO attorney who acts in a prosecutorial function at trial).

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 121 of Plaintiff's Complaint.**

122.    The FRU ASA's work alongside police officers, approving statements in case after case after case. As a consequence, the misconduct and coordination between the Police Officer Defendants Prosecutor Defendants during the investigation of the Battle murder was not unique or isolated. Instead, members of the FRU, as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating statements attributed suspects or witnesses in CPD custody and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 122 of Plaintiff's Complaint.**

123.    At all relevant times, the CCSAO typically staffed the FRU with new, young prosecutors. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the detectives, because performance in the FRU is a stepping stone to getting to the Trial Division of the CCSAO.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 123 of Plaintiff's Complaint.

124. The FRU attorneys are also implicitly taught, through pressure from CPD officers and their own supervisors, that they had to approve detectives' charges even if they did not believe there was enough evidence, because standing in the way could be an impediment to getting into the Trial Division and because they would be punished by their supervisors for not being "team players." Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive to expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 124 of Plaintiff's Complaint.

125. In the end, the very structure of having FRU attorneys at a police station is a significant outlier in policing in the United States—one designed to protect CPD misconduct and secure wrongful convictions on flimsy, coerced, or fabricated evidence.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 125 of Plaintiff's Complaint.

126. The City's failure to train, supervise, and discipline its officers, including Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Burrell in this case. Constitutional violations, such as those that occurred in this case, are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 126 of Plaintiff's Complaint.

127.    The City and its final policymaking officials failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Burrell's ongoing injuries.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 127 of Plaintiff's Complaint.**

128.    The practices described in the foregoing paragraphs were approved by final deliberately indifferent policymakers for the City.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 128 of Plaintiff's Complaint.**

### Burrell's Immense Damages

129.    For nearly 26 years, Burrell was forced to suffer under a prosecution, imprisonment, and potential reincarceration for a murder he did not commit.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 129 of Plaintiff's Complaint.**

130.    Burrell was arrested during his formative years—his mid-20s—and was in the process of building a life for himself. He had small children he loved and cared for. As a result of being wrongfully arrested, prosecuted and convicted, Burrell was estranged from his children—a harm he still mourns to this day.

**ANSWER:    Defendant Prosecutors admit Plaintiff was arrested, prosecuted, and convicted for the murder of Renee Battle.  Defendant Prosecutors deny Plaintiff was wrongfully arrested, prosecuted, or convicted. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 130 of Plaintiff's Complaint.**

131.    Aside from being on bond for part of the time before trial, Burrell spent the better part of two decades—between 1999 and 2019—imprisoned. During that time, Burrell was required to live in conditions that were inhumane and damaging to his physical and mental health. During

his wrongful incarceration, Burrell was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Burrell missed out on the ability to share holidays, the funerals of friends and loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

**ANSWER:** **Defendant Prosecutors admit Plaintiff was out on bond for a period of time before his criminal trial, as well as in custody at jail or prison following his arrest and conviction. Defendant Prosecutors deny the remaining allegations of paragraph 131 of Plaintiff's Complaint.**

132.    Burrell's pain continued after his release, when he was still subject to limitations on his liberty, to bond requirements, and being forced to appear in court again and again.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 132 of Plaintiff's Complaint.**

133.    Having the 1999 murder charges hanging over his head also substantially harmed Burrell between 2019 and 2024. Indeed, though the conviction had been vacated, Burrell was denied housing and employment opportunities due to the bogus charges and prior wrongful conviction. Burrell must now attempt to make a life for himself outside of prison without the benefit of nearly three decades of life experiences, which normally equip adults for the task.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 133 of Plaintiff's Complaint.**

134.    Burrell has suffered tremendous damage, including loss of liberty, physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 134 of Plaintiff's Complaint.**

**LEGAL CLAIMS**

**COUNT I – 42 U.S.C. § 1983**
**Violation of Due Process under the Fourteenth Amendment**

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 135 of Plaintiff's Complaint.**

136.    As described above, the Police Officer Defendants and Prosecutor Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Burrell of his constitutional right to due process and a fair trial.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 136 of Plaintiff's Complaint.**

137.    As described above, the Police Officer Defendants and Prosecutor Defendants deliberately withheld exculpatory and impeachment evidence from Burrell, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Burrell's criminal prosecution.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 137 of Plaintiff's Complaint.**

138.    In addition, as described above, the Police Officer Defendants and Prosecutor Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Burrell, suborned perjury, obtained Burrell's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Burrell during his criminal trial.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 138 of Plaintiff's Complaint.**

139.    The Police Officer Defendants and Prosecutor Defendants concealed/suppressed favorable evidence not yet known to Burrell. In addition, on information and belief, the Police Officer Defendants and Prosecutor Defendants may have fabricated additional evidence that is not yet known to Burrell.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 139 of Plaintiff's Complaint.

140.     As described above, the Police Officer Defendants and Prosecutor Defendants individually, jointly, and/or in concert and conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and witness statements.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 140 of Plaintiff's Complaint.

141.     The destruction and/or loss of evidence was done in bad faith, and/or was done so Burrell could not present obviously exculpatory evidence at trial.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 141 of Plaintiff's Complaint.

142.     The Police Officer Defendants' and Prosecutor Defendants' misconduct directly resulted in Burrell's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Burrell's prosecution would not and could not be pursued, and there is a reasonable probability that the outcome of Burrell's criminal case would have been different.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 142 of Plaintiff's Complaint.

143.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's innocence.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 143 of Plaintiff's Complaint.

144.     As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 144 of Plaintiff's Complaint.**

145.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 145 of Plaintiff's Complaint.**

**COUNT II – 42 U.S.C. § 1983**
**Liberty Deprivation without Probable Cause in Violation of the Fourth Amendment**

146.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:   Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 146 of Plaintiff's Complaint.**

147.     As described above, the Police Officer Defendants and Prosecutor Defendants individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Burrell of criminal activity and detain him without probable cause.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 147 of Plaintiff's Complaint.**

148.     In so doing, the Police Officer Defendants and Prosecutor Defendants caused Burrell to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment. Specifically, Burrell's liberty was limited from the date of his arrest until nearly twenty-years later.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 148 of Plaintiff's Complaint.**

149.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's innocence.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 149 of Plaintiff's Complaint.**

150.    As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 150 of Plaintiff's Complaint.**

151.    The misconduct described in this Count by Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 151 of Plaintiff's Complaint.**

## COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

152.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 152 of Plaintiff's Complaint.**

153.    As described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Police Officer Defendants and Prosecutor Defendants stood by without intervening to prevent the violation of Burrell's constitutional rights, even though they had the opportunity to do so.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 153 of Plaintiff's Complaint.**

37

154.    The Police Officer Defendants and Prosecutor Defendants had a reasonable opportunity to prevent this harm but failed to do so.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 154 of Plaintiff's Complaint.**

155.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to Burrell's clearly established constitutional rights.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 155 of Plaintiff's Complaint.**

156.    As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 156 of Plaintiff's Complaint.**

157.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 157 of Plaintiff's Complaint.**

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

158.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:    Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 158 of Plaintiff's Complaint.**

159.    In investigating the murders of Renee Battle and attempted murder of Marc Davis, the Police Officer Defendants and Prosecutor Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in

38

concert in order to deprive Burrell of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 159 of Plaintiff's Complaint.**

160.    Additionally, before and after Burrell's conviction, the Police Officer Defendants and Prosecutor Defendants further conspired to deprive Burrell of favorable information to which he was lawfully entitled and which would have led to either not being charged, acquittal, or faster exoneration.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 160 of Plaintiff's Complaint.**

161.    In this manner, the Police Officer Defendants and Prosecutor Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 161 of Plaintiff's Complaint.**

162.    In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, and coercing false statements—and was an otherwise willful participant in joint activity.

**ANSWER:** **Defendant Prosecutors deny the allegations in paragraph 162 of Plaintiff's Complaint.**

163.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 163 of Plaintiff's Complaint.

164. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Burrell's clear innocence.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 164 of Plaintiff's Complaint.

165. The misconduct by the Police Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 165 of Plaintiff's Complaint.

## COUNT V – 42 U.S.C. § 1983
### Policy and Practice Claim against Defendant City of Chicago

Count V of Plaintiff's Complaint is not asserted against Defendant Prosecutors, and thus, no answer is required.

## COUNT VI – State Law Claim
### Malicious Prosecution

186. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 186 of Plaintiff's Complaint.

187. The Police Officer Defendants and Prosecutor Defendants, acting as investigators, accused Burrell of criminal activity, knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 187 of Plaintiff's Complaint.

188.    The Police Officer Defendants and Prosecutor Defendants caused Burrell to be improperly subjected to judicial proceedings for which there was no probable cause.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 188 of Plaintiff's Complaint.**

189.    These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 189 of Plaintiff's Complaint.**

190.    Statements, including reports, of the Police Officer Defendants and Prosecutor Defendants regarding Burrell's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, and withheld exculpatory evidence that would have demonstrated Burrell's absolute innocence, destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 190 of Plaintiff's Complaint.**

191.    The Police Officer Defendants and Prosecutor Defendants were aware that, as described more fully above, no true or reliable evidence implicated Burrell in the murder of Renee Battle.

**ANSWER:   Defendant Prosecutors deny the allegations in paragraph 191 of Plaintiff's Complaint.**

192.    The Police Officer Defendants and Prosecutor Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Burrell, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Burrell and continue to do so even to this day.

41

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 192 of Plaintiff's Complaint.

193. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in disregard of the truth and Burrell's innocence.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 193 of Plaintiff's Complaint.

194. The prosecution terminated in Burrell's favor when all charges against him were dismissed.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 194 of Plaintiff's Complaint.

195. As a direct and proximate result of Defendants' misconduct, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 195 of Plaintiff's Complaint.

**COUNT VII – State Law Claim**
**Intentional Infliction of Emotional Distress**

196. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 196 of Plaintiff's Complaint.

197. The acts and conduct of the Police Officer Defendants and Prosecutor Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause—or were in reckless disregard of the probability that their conduct would cause—severe emotional distress to Burrell, as is more fully alleged above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 197 of Plaintiff's Complaint.

198.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's clear innocence.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 198 of Plaintiff's Complaint.**

199.    As a direct and proximate result of Defendants' misconduct, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 199 of Plaintiff's Complaint.**

### COUNT IX – State Law Claim
### Civil Conspiracy

200.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:    Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 200 of Plaintiff's Complaint.**

201.    As described above, the Police Officer Defendants and Prosecutor Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Burrell for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Burrell of these rights.

**ANSWER:    Defendant Prosecutors deny the allegations in paragraph 201 of Plaintiff's Complaint.**

202.    In furtherance of the conspiracy, the Police Officer Defendants and Prosecutor Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Burrell and the intentional infliction of emotional distress upon him.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 202 of Plaintiff's Complaint.

203.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Burrell's clear innocence.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 203 of Plaintiff's Complaint.

204.    As a direct and proximate result of Defendants' conspiracy, Burrell suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 204 of Plaintiff's Complaint.

### COUNT X – State Law Claim
### Willful and Wanton Conduct

205.    Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:** Defendant Prosecutors incorporate their answers to each paragraph of Plaintiff's Complaint as their answer to paragraph 205 of Plaintiff's Complaint.

206.    At all times relevant herein, the Police Officer Defendants and Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Battle murder investigation.

**ANSWER:** Defendant Prosecutors deny that they engaged in willful and wanton conduct and deny the remaining allegations in paragraph 206 of Plaintiff's Complaint.

207.    As described herein, it was foreseeable to the Police Officer Defendants and Prosecutor Defendants, fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Burrell, would inevitably result in extreme harm to him. Avoiding this injury to Burrell would not have burdened The Police Officer Defendants and Prosecutor Defendants in any way.

44

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 207 of Plaintiff's Complaint.

208. Notwithstanding that duty, the Police Officer Defendants and Prosecutor Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Burrell's rights.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 208 of Plaintiff's Complaint.

209. As a direct and proximate result of Defendants' misconduct, Burrell suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**ANSWER:** Defendant Prosecutors deny the allegations in paragraph 209 of Plaintiff's Complaint.

**COUNT XI – State Law Claim**
***Respondeat Superior***

**Count XI of Plaintiff's Complaint is not asserted against Defendant Prosecutors, and thus, no answer is required**

**COUNT XII – State Law Claim**
**Indemnification**

**Count XII of Plaintiff's Complaint is not asserted against Defendant Prosecutors and thus no answer is required.**

WHEREFORE**,** Defendant Prosecutors respectfully requests that this Honorable Court dismiss Plaintiff's Complaint with prejudice, enter judgment in Defendants' favor, award Defendants reasonable attorneys' fees, cost, expenses, and such other relief that this Court deems just and appropriate.

**JURY DEMAND**

Defendant Prosecutors request a jury trial pursuant to Federal Rule of Civil Procedure 38 on all triable issues.

## DEFENDANTS' AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant Prosecutors, while continuing to deny liability to Plaintiff, and pleading in the alternative and without prejudice to the averments in their answer to Plaintiff's Complaint, assert the following Affirmative Defenses:

## FIRST AFFIRMATIVE DEFENSE

*Absolute Prosecutorial Immunity*

At all relevant times, Defendant Prosecutors were Assistant State's Attorney for the Cook County State's Attorneys' Office. In this capacity, Defendant Prosecutors took actions intimately associated with the judicial phase of the criminal process, including but not limited to the preparation for and initiation of judicial proceedings and trial. When Defendant Prosecutors spoke with suspects and witnesses, and took statements, they performed acts toward initiating a prosecution and presenting the State's case. Because the conduct complained of on the part of Defendant Prosecutors is within the scope of their employment as prosecutors, within their role as an advocate of the State, and arises out of the evaluation of evidence and taking statements for the purpose of initiation and prosecution of criminal charges, Plaintiff's claims are barred on the basis of absolute prosecutorial immunity.

## SECOND AFFIRMATIVE DEFENSE

*Qualified Immunity*

At all relevant times, Defendant Prosecutors were Assistant State's Attorney for the Cook County State's Attorney's Office. To the extent any of their actions were not protected by absolute prosecutorial immunity, they are protected by qualified immunity as their actions did not violate Plaintiff's constitutional rights and were at all times proper in light of clearly established law. A reasonable government official objectively viewing the facts and circumstances then confronting

Defendant Prosecutors could have reasonably believed that the actions taken by them were objectively reasonable and were within constitutional limits that were clearly established at the time.

### THIRD AFFIRMATIVE DEFENSE

*Sovereign Immunity*

Plaintiff's claims against Defendant Prosecutors are really claims against State officials based upon their actions as Assistant State's Attorneys, functions that fall within the scope of their employment and authority as Assistant State's Attorneys. Plaintiff's claims against Defendant Prosecutors relate to the initiation of charges against, and the criminal prosecution of, Plaintiff. The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal prosecution. The prosecution of Plaintiff's case is, therefore, well within the scope of the State's Attorney's authority. Plaintiff's claims against Defendant Prosecutors are against the State of Illinois, and thus sovereign immunity shields Defendant Prosecutors for liability in federal court. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Defendants.

### FOURTH AFFIRMATIVE DEFENSE

*Federal Statute of Limitations*

Plaintiff's §1983 claims accrued more than two years earlier than the filing of Plaintiff's Complaint, and, thus, these claims are time-barred.

### FIFTH AFFIRMATIVE DEFENSE

*Illinois Statute of Limitations*

Plaintiff's state law claims accrued more than one year earlier than the filing of Plaintiff's Complaint, and, thus, these claims are time-barred (745 ILCS 10/8-101).

## SIXTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-201*

Defendant Prosecutors are immune from Plaintiff's state law claims under 745 ILCS 10/2-201 of the Illinois Tort Immunity Act which provides as follows: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

## SEVENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-202*

The acts or omissions that Defendant Prosecutors allegedly took would have been acts or omissions in their capacity as public employees in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Defendant Prosecutors are immune from suit.

## EIGHTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-204*

Because Defendant Prosecutors were, at all times relevant to the Plaintiff's allegations, public employees acting within the scope of their employment, they are immune from suit for any injury caused by the act or omission of another person.

## NINTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-205*

Defendant Prosecutors are not liable for any injury caused by their adoption of an enactment, failure to adopt an enactment, or their enforcement or failure to enforce any law.

## TENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-208*

Defendant Prosecutors are not liable for injury caused by their instituting or prosecuting any judicial or administrative proceeding within the scope of their employment, unless they acted maliciously and without probable cause.

## ELEVENTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-212*

To the extent that any Count in this Complaint seeks recovery based on joint action between public employees, Defendant Prosecutors are immune from suit pursuant to 745 ILCS 10/2-212.

## TWELFTH AFFIRMATIVE DEFENSE

*Tort Immunity Act 745 ILCS 10/2-213*

Defendant Prosecutors are immune from punitive or exemplary damages under 745 ILCS 10/2-213 which provides as follows: "Notwithstanding any other provision of law, a public employee is not liable to pay punitive or exemplary damages in actions brought against the employee based on an injury allegedly arising out of an act or omission occurring within the scope of employment of such an employee serving in a position involving the determination of policy or the exercise of discretion when the injury is the result of an act or omission occurring in the performance of any legislative, quasi-legislative or quasi-judicial function, even though abused."

## THIRTEENTH AFFIRMATIVE DEFENSE

*Attorney Fees*

Plaintiff is not entitled to attorney fees for his state law claims. *See Kerns v. Engelke*, 76 Ill.2d 154, 166 (Ill. 1979).

## FOURTEENTH AFFIRMATIVE DEFENSE

*Failure to Mitigate Damages*

To the extent Plaintiff failed to mitigate any claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff had a duty to mitigate claimed injuries and damages, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

## FIFTEENTH AFFIRMATIVE DEFENSE

*Res Judicata, Judicial Estoppel, Collateral Estoppel, and Waiver*

Plaintiff's claims in the Complaint are waived and/or barred by the doctrines of *res judicata, judicial estoppel* and collateral estoppel to the extent that they involve issues or claims that were, or could have been, resolved in the underlying criminal, or post-conviction proceedings.

## SIXTEENTH AFFIRMATIVE DEFENSE

*Personal Involvement*

Defendant Prosecutors cannot be held liable for Plaintiff's 42 U.S.C. 1983 claims unless they individually caused or participated in an allege constitutional deprivation because individual liability for damages under 42 U.S.C 1983 is predicated on personal liability. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

## SEVENTEENTH AFFIRMATIVE DEFENSE

*Vicarious Liability*

To the extent Plaintiff alleges a failure to intervene claim, such a claim has no basis in the Constitution and the "Supreme Cout has held many times that 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen* 48 F.4th 816, 834-835 (7th Cir. 2022 ( Easterbrook, J. concurring).

## EIGHTEENTH AFFIRMATIVE DEFENSE

*In pari delicto*

Any recovery of damages by Plaintiff is barred by the doctrine of *in pari delicto*.

## NINETEENTH AFFIRMATIVE DEFENSE

*Comparative or Contributory Fault*

To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by the negligent, willful, wanton and/or other wrongful conduct on the part of the Plaintiff, any verdict or judgment obtained by Plaintiff must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this cause.

## TWENTIETH AFFIRMATIVE DEFENSE

*Unconstitutionality of Punitive Damages Award, If Any*

An award of punitive damages would deprive Defendant Prosecutors of due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution where liability for punitive damages has not been proven beyond a reasonable doubt or at least by clear and convincing evidence, or where the award of punitive damages is disproportionate to actual damages.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

*Setoff*

In further response to Plaintiff's Complaint, and without waiving any of the responses in the foregoing Answer, Defendant Prosecutors are entitled to a setoff on the amount of the final judgment for any prejudgment amount received from any other party to this lawsuit and/or third-

party entity as compensation for the alleged wrongs or harms that are the subject of Plaintiff's Complaint.

WHEREFORE, Defendant Prosecutors respectfully requests that this Honorable Court dismiss Plaintiff's Complaint with prejudice, enter a judgment in Defendants' favor, award Defendants reasonable attorneys' fees, costs, and expenses, and award Defendants any other relief this Court deems just and reasonable.

Respectfully submitted,

Attorneys for Defendants MARIA KURIAKOS and PAUL KARLOVICS

By: */s/ Danielle Mikhail*
One of the attorneys for Defendants Maria Kuriakos and Paul Karlovics

Robert Shannon
Anshuman Vaidya
Danielle Mikhail
Hinshaw & Culbertson LLP
151 North Franklin St., Suite 2005
Chicago, Illinois 60606
Telephone: 312-704-3000
Facsimile: 312-704-3001
rshannon@hinshawlaw.com
avaidya@hinshawlaw.com
dmikhail@hinshawlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day and was served upon all counsel of record via the Court's CM/ECF system.

*/s/ Danielle Mikhail*
Danielle Mikhail